next case is Charles Brennan versus the City of Philadelphia this is case number 20-2512. Mr. Cerruti. Thank you. Good morning, may it please the court. My name is Jeremy Cerruti. I represent the appellant Charles Brennan in this matter and I respectfully request two minutes for rebuttal. Granted. Thank you. Your honors, this case should not have been for specific key reasons and those include that the case the evidence shows that there's more than sufficient evidence to support causation and pretext for Mr. Brennan's retaliation claims. I think it's important to note that Mr. Brennan dedicated practically his entire professional career to the City of Philadelphia. In fact, he worked for the city for over 30 years in various capacities including most recently from January 2016 to January 2018. And we're here as a result of his termination then. I submit to your honors that the timing of events in this case, the pattern of antagonism that Mr. Brennan was subjected to between the time of his complaints and his termination, the disparate treatment that he was subjected to, and other evidence of contradictions in the record make it such that a jury should be deciding this case. Why is the timing suspect? It seems to be five weeks. Is it your argument that five weeks is inherently suspect? I think, your honor, that the record shows that it's approximately 41 days. And I know the case law doesn't draw a specific line in the sand and say it has to be four days. It has to be six days. But there's case law, in fact, the Fasold versus Justice case that indicates that even in instances where there's less than two months separation between the final protected activity and the termination or adverse action, that is an evidentiary basis from which an inference of retaliation can be drawn. And I think that when we look at the district court's opinion, it was as if the pieces of evidence were analyzed completely independently of one another, rather than in conjunction with one another. And while the timing of 41 days in and of itself may not be what the court has considered unusually suggestive, I think when we look at the other that I'm happy to go through, that that paints a picture, a more clear picture of the context and of the retaliatory animus. All right. Well, I think you would be right if your premise is correct, but I'm not sure your premise is correct about comparators. Because the folks that you cite as comparators, did they have the same sort of tension with their superiors? It seems to me, I don't want to oversimplify it, but you may have an opinion on this. The case seems to come down, the legitimacy of the summary judgment seems to come down to whether or not he was fired because he was made to go to sensitivity training because of the color of his skin, others weren't, in which case you get a vacator here and you're back in the game, or he was fired because he was insubordinate. And there does seem to be a lot of record evidence to support that he just, he wasn't getting along with his superiors. He made that comment, uncouth comment in a very public arena, very public facing engagement that the city had. There's no disputing that, right? There is a dispute at the baseline about whether he made certain comments or not. When I say the uncouth comment, I'm talking about the comment about the woman who was presenting. There's no dispute about that. Part of it is disputed, your honor, because what we have in the record is Mr. Brennan testifies that he never said anything about the president or the head of SAP, the female head. Ms. Derinick Lopez, his manager, said, I was there and he mentioned comments about she looks too young or pretty to run the company. He's unequivocally denied that. He's clear that that was not the case, that comment was not made. But the question is not whether it was made or not made, right? If a supervisor makes a factual mistake, that doesn't establish that the reason for firing was discriminatory. If they just believe that was the case, that's enough. So that doesn't matter so much. I agree. I agree that you're right in terms of a mistake, but she testified she was present and she considered hearing that comment in deciding to then reach out to him and suggest sensitivity training. So if there's a dispute about whether the comment was made or not, and she's saying, yeah, I witnessed it, and based on what I heard, I was offended, and then I went to Mr. Brennan and suggested sensitivity training. I think if a jury concludes that he never made the comment, then they could conclude that it's not just mistaken or an error, that it was something behind that and that there was no basis, in fact, for her to then go to him and say, you should go to sensitivity training. The comparator question that Judge Hardiman began with, I'd like to press you on that. The cases that you cite to us, analyzed comparators, and they want to see whether the plaintiff and the comparators are similarly situated with respect to position, title, supervisory functions, and other factors. And for instance, you propose Mr. Brennan's supervisor, Derenek Lopez, as a comparator, but she's obviously a supervisor, so she can't be a comparator. You suggest that Mr. Atkinson and Mr. Abernathy are comparators, but they don't have the same supervisors as Mr. Brennan. Their conduct was different, and the response to their conduct was at the discretion of a different supervisor. So that's just setting the table. Then, of course, I'd like to speak about Mr. Connors after you've addressed this initial question. How do you get past the fact that the persons you note to be comparators are seemingly, based on the standard that you alluded to, not comparators? Right. So the analysis of similarly situated comparators, I think it's clear that we don't need to prove a clone, right? We don't need to prove that they were identically situated. I think that the record evidence shows that they were similarly situated in most relevant respects. And what I mean by that is they all were city officers, right? They were the highest level city officers. No, was Mr. Atkinson and Mr. Abernathy and Ms. Derenick-Lopez, were they the exact position? Did they work as the innovation and information technology officer? No, but they all were high level city officials. You do agree that someone's supervisor cannot be a comparator. Well, I think in this case, the context is important because both Ms. Derenick-Lopez reported up to Ms. Slusser, who was the chief of staff for the mayor, and Mr. Brennan reported directly to Derenick-Lopez, who reported up to Ms. Slusser. What case do you have where this court or any other circuit court has said that a supervisor is a comparator for an underling that was fired? I don't, Your Honor. I understand. All right. So you might want to try one of the comparators. Yes. Thank you, Judge. So I think Nolan Atkinson, the chief diversity officer, is probably the best and most similar comparator. He was also a city officer. He reported to Ms. Slusser, as Mr. Brennan reported up to her, and the conduct he engaged in was of comparable seriousness, perhaps more egregious. Mr. Atkinson is the gentleman who made comments to Mr. Brennan and others when talking to them about the demographics of the department and their racial numbers in the department. Your white numbers are moving in the wrong direction. You have too many whites. Asians. You have too many Asians in your department. Hiring white women. Well, the best that gets you is potential discriminatory animus on the part of Mr. Atkinson. But you know, what Atkinson did, you know, if he expressed his views in that way, saying those things isn't a fireable offense, is it? Well, he would have to take some action on those, right? Yes. What I would submit, Your Honor, is that the behavior is comparable in the sense that the city is alleging that there were complaints made about Mr. Brennan in terms of comments Mr. Atkinson made. Yeah, but they seem to be non-comparable in the sense that the comments Brennan made that got him in some trouble with the supervisors were very public-facing comments, and Atkinson is talking within the small orbit of the executive staff talking about diversity in hiring. Two very different things, aren't they? To some extent they are, but I think that what is similar is Mr. Atkinson was speaking, meeting with other department city officials, and many of them, and not only did Mr. Brennan express concerns to Ms. Derenick-Lopez, who conveyed those to Ms. Slusser, but other folks did too, and Ms. Derenick-Lopez admitted that. I received other notification from other folks that were meeting with Mr. Atkinson that he made similar comments, and so Ms. Derenick-Lopez and Ms. Slusser, who were the clearly of these comments, and they took no action. But I think this gets back to where I started with you, which is why did they let him go, right? Because if they let him go because of the comments, I think there's some parallelism with what you're saying about Atkinson's comments, but if the reason they let him go wasn't because of what he said, it's because of how he reacted when they tried to counsel him. In other words, hey, shouldn't have said that, we got a little bit of a problem, people are complaining, we want you to work on your tact, right? We want you to go to some training, we want you to do better. As I understand the city's argument, he didn't get fired because he made the comment about the SAP executive. He got fired because he wouldn't work with him. He was oppositional. He was at odds. He was basically saying, you can't make me do this have that kind of power over you. So I think there's a dispute in the record, respectfully. I think that the record reflects both in the company, sorry, the city's interrogatory responses and supplemental discovery responses that they wanted to cover the gamut. So they made clear that he was fired for several reasons, or so they claim. For the comments, for his alleged refusal to attend sensitivity training, and for alleged intra-office disputes, I'll call them, as they characterize them. So, and then when I, when we have Ms. Lusser's testimony, and I ask, well, why was he terminated? Was it the comments? No, it wasn't the comments. It was his refusal to attend sensitivity training. So, you know, if the only, the one and only reason they were clear about and alleged was the issue of the sensitivity training, we could address that, and I will, but there is a dispute, and I think there's a bit of a contradiction there. We do have, I mean, you're trying to have it both ways, because you're trying to rely on temporal proximity when it's not that proximate, but then if you look at temporal proximity in sequence, nobody here is getting fired after comments, right? After comments, there's then a step of, okay, do we do anything about the comments? And it's only after turning down opportunities to do something after the comments, like you should go to sensitivity training. Well, you've got to order me to go, and if you order me to go, then I'll file a complaint. So, if anything, temporal proximity cuts in the city's favor here. It's very temporally proximate to that. It's not very temporally proximate to the initial comments. Well, I agree that the events were happening around the same time. I don't agree that the proximity cuts in favor of the city, frankly. I think that what we have is a few things, right? We have his making complaints shortly after he meets with Atkinson about the discriminatory hiring comments, and then we have, in the summer of 2017, Ms. Derenek Lopez first reaching out to Mr. Brennan to talk about sensitivity training at all. And so, frankly, if sensitivity training was so important and urgent, why did the city let between July and January go without really, you know, ordering him to go or following up or taking any steps to ensure that he went? I mean, if they believe that he made these comments to the public and they're so egregious, as a manager, you go and, hey, you have till next Friday. You have the next month to get this done, and they never did that. He's a CIO. Presumably, the response is he understands the importance of it. But let me ask this question, if I may. You have focused on the fact that, only white men are sent to sensitivity training. One of the comparators that you allude to is Mr. Connors. As I understand it, Mr. Connors made some remarks. As a result, he was asked to go to sensitivity training. He, in fact, went and filed an apology to those who were in attendance when he made the statements that he made. How is his experience useful to you in talking about comparators and treatment that is useful? When Mr. Brennan expressed his final complaint of discrimination in December of 2017, he was aware that Mr. Connors had been sent or went to sensitivity training. He knew that information. He was almost certain as well that Mr. Atkinson hadn't, nor had anybody instructed Mr. Atkinson to do that. It goes to the basis and the good faith nature of Mr. Brennan's complaint to Derenick Lopez, his final complaint. He conveyed to her, look, I'll go to sensitivity training if you order me to go, but I don't think this is fair, and I feel like you're making me, you're making white males go, but I complained to you about Mr. Atkinson's comments for months, and nothing's happened to him. He's still working here. He wasn't suspended that I know of. He didn't go to sensitivity training that I'm aware of. So this seems unfair and discriminatory. So it's useful in that way because it serves at least partly as a basis for his final complaint and the good faith nature of it. I'm sorry? That only works if Atkinson is a comparator. Yes, I think you're right, but I don't think he needs, Mr. Brennan needs to prove Mr. Atkinson is a comparator to prove that he had a good faith basis for expressing the complaint to Miss Derenick Lopez in December 2017. Because even if he, in other words, objectively Mr. Brennan conveyed what he understood and had knowledge of, and so I know the good faith determination is a reasonable person standard. I get that, and it's objective, but I don't think Mr. Brennan has to prove unequivocally that Mr. Atkinson is a comparator to show that he had a reasonable good faith belief that he and Mr. Connors white men were being asked to go to sensitivity training and Mr. Atkinson, who had made pretty egregious comments, racial comments, to not only him, but other city officials repeatedly over a period of time, wasn't asked, and in fact, nothing was done. Well, again, if he was fired because of that, you win, but that's not what they, the reason they articulated, right? And we're dealing with pretext under Fuentes versus Persky, and we've got to look at the articulated legitimate non-discriminatory reason, which was what? Well, I think that's... I mean, I know you think it's illegitimate, but tell me what their legitimate non-discriminatory reason was according to the city. So based on the record, the city has taken the position that he was terminated for the comments, for allegedly refusing to attend sensitivity training, and for alleged inter-office conflicts with co-workers. That's what I alluded to before, if maybe not perhaps specifically enough, but I did, and what I meant by that is I think there's a dispute in the record, and I submit that there is, because Ms. Lusser said it wasn't the comments, it was the issue of the... Conflict. The sensitivity training. Okay. Right, and so, you know, that's a contradiction, and I think a jury would hear that and say, wait a minute, what really was it? Was it these three things? Was it one thing? Why if in their interrogatory responses, they set out this narrative, and in the termination letter, they mentioned the comments and the refusal to go to sensitivity training, but then why underwrote this Ms. Lusser saying, no, it wasn't the comments? Okay. I think that's where the dispute comes in, and that's, I think, where there's clear room for dispute and jury determination. All right, thank you. We'll hear you on rebuttal, Mr. Cerruti. Thank you. Ms. Diffley. Good morning, your honors. Nice to be back in court. Haven't been in court in a year. Nice to see you both. Very pleased. So, this case is about a former senior official who needed excellent communication skills to do his job, about whom numerous people complained that he had deficiencies in his communication skills, whose supervisor asked him to address those problems simply by attending a training, and his response was to be obstinate and to say, I'm not interested in improving myself. You're going to have to order me. You're going to have to make me. And I think, based on that record, the city's had a perfectly legitimate nondiscriminatory reason to fire him. All right, but it's not as clean as the city saying, look, we're letting you go because you're oppositional or you're obstinate, right? It wasn't that clean, right? What about Mr. Cerruti's point that they gave sort of a menu of reasons and then the city walked back some of the reasons and really focused just on, well, he didn't go to sensitivity training? Respectfully, Judge Hardiman, I don't think the record is equivocal on the reasons for firing him. I think that the comments, as I believe you said during Appellant's presentation, it wasn't that he was fired for the asked to attend training in response to that. Yeah, give us the record support for that. I mean, I think the first place we can look is the termination letter. The termination letter itself says, yes, you didn't make comments, but I've made you aware of these comments and given you the opportunity to address them and you refused to do so. I think they were very clear with him that at best it was a combination of the comments plus the failure to go, but really it was that after asking him to redress a professional problem, they were basically facing someone who was saying, no, I'm not going to do that. All right, then let me sort of zero in on what I understand Mr. Cerruti's argument to be, which is if in fact he did not make the set up, he sort of asked to take on a burden that was entirely inappropriate if he never made inappropriate comments, right? And I understand plaintiff's argument. The record is a little muddy on that, not a good summary judgment record, send it back for trial so that a jury can determine whether did he really make these comments or did he not make the comments, that sort of thing. So why is he wrong about that? Because I think that at best he says, I didn't make a single comment. And in fact, the record shows that there was a long standing pattern of him making abrasive and insensitive comments and that those comments actually predated Ms. Dernek Lopez's supervision of him and the protected report here. For example, when Ms. Reinhart, with whom he clearly got along well, Ms. Reinhart reported that people came to her with concerns about the way that he was speaking to audiences and the way he was representing the city. Fair point, fair point. But, you know, Mr. Atkinson saying some things, there are too many whites and Asians. We don't see any response to that. Does that, doesn't that suggest that there's, you know, that might be illegal at the very least. It might be, you know, considered, you know, offensive and politic, whatever. Isn't it relevant that he's picked for the sensitivity training and gets into this squabble over it and not Atkinson? Well, I think that I acknowledge that Mr. Atkinson supposedly made these extremely blunt comments. Obviously, I don't know if he did or not, but for purposes of summary judgment, I acknowledge we have to believe that he did say them. But this is not a case about whether the diversity initiative or those comments were good policy or even, you know, it crossed the legal line. The question is, was Mr. Brennan's complaints about the policy and the comments, what motivated Ms. Derinick Lopez and Ms. Slusser to fire him? And so really, whether he did or didn't say those comments is completely unrelated to the core issue. He's fired a month after threatening to file a charge with the EEOC. I mean, isn't that suspicious? There's some proximity there. This might be retaliation for that. I think, you know, to begin with, in our brief, we take the argument that that December report of discrimination is not protected comment. And the reason it's not protected comment is because he essentially had already done the things that were the fireable offense. And there's case law, the Curry case, that says you basically can't, you know, utter a word, discrimination, and all of a sudden you have this cloak of protection from Title VII. And I think that that's exactly what happened here. But even if that report is protected, there's, you know, there's a good five-week gap. And I think the court's case law is pretty clear that that's not enough. I think the Yu case says, you know, basically you have a few days to a week to have unusually suggestive timing. But can I get back to the comments? Because I'm not sure I'm clear in my own mind, and I want to hear from Mr. Cerruti on rebuttal on this as well. Which comments that Brennan made are unequivocal in the record for purposes of summary judgment, and which comments are contested? Yeah, the only contested comment is the comment about the vice president's attractiveness. He admits that at that SAP conference he did, in fact, you know, make a comment basically about women having more shoes. There's no dispute that at the Smart Cities conference, which was several months later, he made what was basically understood as kind of a tone-deaf comment. That was about the quality of the food and all that, you know, we can't afford this, you better eat it sort of thing. Exactly, that's right. So the contested comment that's sort of out for purposes of summary judgment is the attractiveness of the SAP exec. But you've got the shoes comment, you've got the food comment, what else do you have that's unequivocal? That long before Ms. Derinick Lopez was his boss, when Ms. Reinhardt was his boss, that Ms. Reinhardt said, you know, numerous people came to her and said that he made offensive comments. And in fact, it was... Did she bring that to his attention at all, or did she counsel him on that? Or did that just come out sort of in discovery of the case? No, she said that she spoke to him and to kind of control himself at meetings and to tone down the way, you know, his speech at meetings. And, you know, I think importantly, so, you know, obviously Mr. Brennan's job involved a lot of public facing, you know, speaking and liaising with the tech community. And the record testimony shows that when Ms. Reinhardt was CAO, she actually literally like public facing interface with the community because of the sort of... That everyone understood that Mr. Brennan was not really a good representative for that. So that's the way that the former boss, you know, kind of dealt with the situation. So is the record clear that the city fired him because of the cumulative effect of everything you just mentioned? Or was it more, you know, the one point that... The one sort of point of insubordination that, you know, we've asked you to get some counseling and some help so that you can do a better job with this public facing occupation you have, and you're refusing to do it. You're uncoachable. I think it's the latter. And I think the record is... And that's the only reason he was fired, the sort of insubordination slash obstinacy. Yeah. I mean, I wouldn't even use the word insubordination because I think at the level, the executive level that he was, right, it's not like it's not like a cop where, you know, you have to give progressive discipline. I mean, you basically, Ms. Dernick-Lopez and Ms. Lusser were like, we literally never encountered someone in such a senior level position where when you bring a problem to their attention, they're just completely obstinate to it and uninterested in addressing a professional deficiency. You know, I think when you're at a certain professional level, you want to better yourself. And his answer, though, is the only reason you thought it was a deficiency was you were singling me out because of my race. But I think that Mr. Brennan acknowledges in several places in the record that he was aware that other people had problems with him, not just his supervisor with whom he had a problem. There was basically a statement that he wrote that he gave to Ms. Lusser at the time that he was terminated, which says, like, you know, I made some comments at the SAP conference and some people were offended by it. You know, I understand he disputes part of what was said, but what he doesn't dispute is that others were offended by what he said again. And those parties who were offended were completely neutral third parties who had no ill will towards him. But again, he wasn't fired because he offended the folks at the SAP conference. It's because his whole affect indicated an unwillingness to improve and change so that there wasn't the same problems were going to recur. That's right. I mean, this was a credible, critical part of his job, his ability to be able to communicate and build partnerships, you know, external bridge building. And there was a clear deficiency, and it was a deficiency that went on over a long period of time. You know, admittedly, Ms. Deranick Lopez came into the after a couple months on the job. It was like, OK, let me look at what's going on and what I'm hearing and what I'm seeing. And yeah, I think this is a problem. And I think it's totally reasonable for her to say, I think this is a problem and we need someone to represent the city's interests in the best possible way. And we need someone who, if there's an issue with that, is going to be interested and willing in trying to improve themselves. I have a question. Is Mr. Abernathy a viable comparator? Different job, supervisors and apparently different treatment with regard to. Clear based on this, this court's case law that none of the three people he identifies are comparators. I think there was questioning about Ms. Deranick. Lopez had a different supervisor. Mr. Abernathy had an entirely different supervisor. So even considering it under this rubric of, well, Ms. Slusser sort of as chief of staff oversaw a lot of people. In fact, Mr. Abernathy reported to a completely different line of supervision. He reported to the different infractions. And the test is not, for similarly situated, is not just comparable seriousness. The test is, as your honor read when Appellant was putting on his argument, you have to basically have the same boss, very similar actions. And you just don't have that here. And the final point I want to make on that is that there are actually similarly situated people here, which Mr. Brennan completely ignores. The similarly situated people here are the other two commissioners who raised concerns about Mr. Atkinson's comments and the diversity initiative to Ms. Slusser. So she was their supervisor and they made the same complaint as he did. And the record evidence is not only were those people not fired or retaliated against, those concerns were elevated up to Mr. Slusser, who brought them to Mr. Atkinson, and actually things got better. So he listened to the concerns and the counseling and changed his behavior or comments accordingly. All right. Thank you. All right. I think we understand your argument. Thank you very much, Ms. Diffley. If you have nothing further, we'll go to Mr. Cerruti's rebuttal. Thank you very much, Your Honors. Mr. Cerruti, would you mind starting with what Ms. Diffley said about, I think she conceded that the comment about the attractiveness of the SAP executive is off the table. But she cited several other comments that do seem to be undisputed in the record. Is that not right? So a couple are undisputed. Yes. So, Your Honor, the comment that he made making comment about women having more shoes under their desk, I believe he admitted to that. Comment about the food? Yes. And there's a slight dispute in that, although a dispute nonetheless. I think that what the defendant claimed he said at the conference was basically none of you can know. It was a joke. I was trying to entice them to stay. So I said, oh, it's really fancy food out there from a famous chef. You know, food none of us can probably afford or most. Well, what you just said, though, didn't deny that he said it. What you just said, as I heard you, was you gave a more innocuous motive for why he said what he said. In other words, he wasn't intending to insult. He was intending to encourage people to enjoy the comment. Right. Well, yes, he made a comment. And I think that, you know, I don't want to play semantics here, but I think in this case it may be important because I think there is a difference in him saying none of you can afford this sort of like, well, I'm up here. I'm a city official. You guys are peons. And what did what exactly did he say? None of us. It's probably food none of us can afford. OK. All right. So we included him. All right. So that's undisputed. And then and then was definitely also pointed out that predecessor supervisor had had talked to your client about tact or. You know, being a little bit just being a little bit more judicious in the way he spoke at public facing events, did that happen as partly? Yes. But I think that's sort of a red herring. And this is why, Judge, the question is, what did the decision makers at the time or leading up to that? No. Miss Reinhart was long gone by the time they terminated Mr. Brennan. So Mr. Nick Lopez and Miss Lusser and the mayor made the decision to terminate. They didn't know of any alleged issues that he had under. So that only came out in discovery that only came out in discovery. And in fact, Miss Reinhart would also came out as this. Miss Reinhart said I had a very good relationship with Mr. Brennan. He was direct, but I never I never witnessed to make any inappropriate comments. I never disciplined him. I never reported up to anyone that he was made and did anything inappropriate. So all right. So if we take if we take Reinhart off the table, what we're left with is is two comments that. At least some reasonable people could think put the city in a bad light. He's confronted with those comments. He's asked to change his behavior. He's asked to get some training. He refuses. So under Fuentes, how do you get over the pretext hurdle? It seems like that's a legitimate non-discriminatory reason, especially as Miss Diffley said, this is not a civil servant entitled to progressive discipline. This is an executive making a lot of money. So why how do you get over pretext? So I think there's two main issues to answer your question. One is if the very comments or at least even one of them, frankly, because there were so few, if there if one comment even is in dispute, then I think it gives a jury pause to say, well, what was the basis for Derinick Lopez to even go to him in the first place? She said she was offended at one of the comments, this comment that is disputed at the comment they claim he made at this meeting. And it sounds like you're asking us to establish a rule that says if if the employer gives three reasons and two of them are legitimate and one of them is not, then we should treat the other legitimate ones as illegitimate because they misfired on one of the articulated reasons, is that? Not necessarily, but I think that there is case law and hopefully I could find it, but I think there is case law that says if the defendant proffers a sort of a bag full of reasons, you know, a plaintiff can get over summary judgment by casting down on a substantial portion of them. And in this case, what we have is the defendant saying he was terminated for the comments, he was terminated for this alleged Where in the letter does it say we're terminating you because of the comments? I thought Ms. Diffley's argument was that the comments were referenced in the termination letter, but it wasn't sort of a direct causal connection that you're being terminated because of these comments. No, in that language, it doesn't say you are being terminated because of the comments, but that's the first sentence in the termination letter. Why does it say they're terminating him? Well, it doesn't really. It sort of, it gives a general conclusion, you know, general explanation for it. But the first thing they say is the comments and, Judge, in their interrogatory responses, the very first thing they say is the reason for termination is plaintiff demonstrated poor decision making in both his interactions with city personnel and outside individuals exemplified by comments plaintiff made during a meeting with SAP North America on July 18, 2017. But look, I can read the first paragraph as well as you. It's a story. The story is first sentence. There have been significant concerns about your comments. Second sentence. I've been made you aware of them. I've given you a chance to address them and prove them. So the comments themselves are not the basis of the firing. They're the backdrop to the request. Third sentence. You have not availed yourself of these opportunities have in fact ignored my direction to remediate. So it builds to the ignoring as such, as such back most immediately to the ignoring. We are separating you from your employment, right? That's a story that is not, you know, the immediate cause is not the comments. The comments are the backdrop for how it built up to this point where now we need to terminate you. I understand that point, but I think they're sworn interrogatory responses is, you know, say something different. They specifically say poor decision making. And then it says exemplified by comments you made he made during the North American S.A.P. North American conference. That's what they lead by. So they're saying the example of this poor decision making are these comments you made at the meeting. Those could have referred to the shoes, not the attractiveness too. Was the S.A.P. the attractiveness or the shoes or could it be either or both? It was both. But I, you know, I asked Ms. Derenick Lopez and she said, I witnessed the comment about your, she's too young and pretty to run the company. That was the comment I was offended by and that contributed. The fact that your client denies that comment is enough to survive summary judgment because the supervisor says I heard this and that was enough. But he denies it. You say that's enough of a genuine issue material fact and because it was one of her bases, therefore this has to go to trial. Yes, for that reason and for the reason I said earlier, which was, you know, I submit that there's a contradiction in record. They are clear that it was poor decision making exemplified by comments. Then once they realized, you know, the comments are going to be disputed, then in the deposition, Ms. Luster said, no, it wasn't the comments. It wasn't the comments. So I think that's a sufficient dispute about the reason that would leave a jury wondering, well, what was the real reason? And if it was both, why are they only saying one? Or if, you know, it certainly leads, I think would lead reasonable inferences to conclude that they're either changing their story, shifting it, covering it up or realizing, hey, we know the comments are disputed and now we have to get around that. Could you please read the end of that interrogatory response? Sure. And on October 12, 2017, during Smart Cities Workshop event, he was informed that he needed to attend sensitivity training. He refused to do so. This failure was set against a backdrop of continued interpersonal conflict with his staff. As a result, his supervisor no longer had confidence in his ability to fulfill the job duties assigned to him. And, you know, the issue with the inner, I'll be brief, but the inner part of the issue with the interpersonal conflict, again, no discipline for it. They didn't really speak to him about it. The decision-makers. And when asked in her depositions, Lesser said it was the sensitivity training. All right. Thank you very much, Mr. Cerruti. Thank you so much. Thank you, Ms. Diffley. We appreciate your candor. The argument was very helpful. And as Ms. Diffley said, it's wonderful to see both of you in the courtroom. So we'll take the matter under advisement. Thank you.